Filed 1/17/25  P. v. Uribe CA1/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSHUA URIBE,<br><br>    Defendant and Appellant. | A164502<br><br>(Contra Costa County<br>Super. Ct. No. 11965342) |

In June of 2021, defendant Joshua Uribe accused his then-girlfriend Jane Doe of cheating on him, dragged her into a bedroom, and stomped on her face, causing her to lose consciousness.  Two days later, Uribe pleaded no contest to domestic violence in connection with a previous incident involving Jane Doe, and was placed on probation and ordered not to have any contact with Doe unless it was peaceful.  That evening, Uribe again attacked Doe, and later threatened to kill her, her mother, and her daughter.  A jury found Uribe guilty of willful infliction of injury on a person with whom he was in a dating relationship, criminal threats, dissuading a witness from reporting a crime, and disobeying a court order, and the trial court sentenced him to four years in prison.  Uribe raises a number of evidentiary and instructional challenges to his conviction, alleges prosecutorial misconduct, and argues that the trial court erred in imposing the upper term on his domestic violence

1

conviction based in part on certain aggravating factors that were not found true beyond a reasonable doubt by the jury.

On October 18, 2023, we affirmed Uribe's conviction and sentence after concluding that the alleged error in imposing the upper term was harmless. (*People v. Uribe*, Oct. 18, 2023, A164502 [nonpub. opn.], pp. 39–42 (*Uribe*).) This matter is back before us following the Supreme Court's transfer with directions to vacate our prior decision and reconsider the cause in light of *People v. Lynch* (2024) 16 Cal.5th 730 (*Lynch*), which clarified the standard of prejudice to be applied to claims of sentencing error of the type that Uribe alleges here. After reconsidering the cause, we again affirm the judgment of conviction, but conclude that we must vacate Uribe's sentence and remand for resentencing under *Lynch*.

## BACKGROUND

### 2009 Domestic Violence Conviction Involving Emily C.

Uribe dated Emily C. for about three months ending in September of 2009. At the time, Emily C. lived in a condominium in San Jose with her mother, where Uribe spent "most days and nights." Sometime after midnight on September 18, 2009, Uribe "was upset and intoxicated yelling at [Emily C.] saying something about cheating accusations." Uribe began punching Emily C. on her face and body. He then grabbed her by the arm and dragged her into the bedroom. Uribe punched Emily C. on both sides of her head, on her abdomen, and on her ribs and hips. He then started to strangle her, at a "10" on a scale of 1 to 10, for 10 to 20 seconds. Emily C. began to feel "dizzy" and "lightheaded," and her "vision was blurring." She managed to break away from Uribe and ran into her mother's bedroom where she and her mother barricaded the door with their bodies. Emily C. called her best friend,

2

who called 911.  Uribe left before the police arrived.  Emily C. sustained a black eye and multiple bruises on her ribs, abdomen, and neck.

On October 28, 2009, Uribe pleaded no contest to a felony violation of Penal Code section 273.5, subdivision (a)[1] based on the incident.

**Domestic Violence Involving Jane Doe**

Jane Doe and Uribe met in April 2020 and began a dating relationship. Doe was 5 feet 3 inches tall and weighed around 150 pounds.  Uribe was almost six feet tall and weighed about 200 pounds.  Uribe lived with Doe in her condominium in Concord "on and off" for a few months.  Doe and Uribe used cocaine almost every day.  Uribe drank alcohol every day, and Doe described him as an "alcoholic."

**July 9, 2020 Incident**

Around 3:10 a.m. on July 9, 2020, Ian Ito heard an argument outside his apartment building in Santa Cruz.  He looked out of his window and saw a man and a woman arguing inside a large car.  Ito heard Uribe demand a cigarette from Doe, and then "placed both hands in the collar bone region of the woman's neck and shoved her backwards into the driver door."  Doe "exclaimed in pain," and Uribe yelled, "I will fucking murder you."  According to Ito, Uribe "coerced" Doe "to drive away down the street, in which after about 50 or 60 feet, they stopped at an intersection and did not move."

Ito left his apartment and called 911 from the street while watching the vehicle.  He heard Doe "protesting that she did not want to drive, that she was too, quote, 'fucked up' from the inebriation and whatever else had been going on that night."  Uribe "continued to yell at the woman to drive and she did not want to."  Uribe repeated " 'I will fucking kill you.' "

---

[1] Further statutory references are to the Penal Code.

Police officers responded to the scene and photographed Doe's injuries, including her bloody nose.  Doe gave a statement to the officers, but did not tell them the "full story" because she did not want Uribe "to get . . . in trouble."

On June 9, 2021, Uribe pleaded no contest to a misdemeanor violation of section 273.5, subdivision (a) based on this incident.

### June 2021 Incidents

At around 6:00 p.m. on June 8, 2021, Doe and Uribe were at Doe's condo in Concord.  Uribe was looking through Doe's phone, asking, "whose number is this and whose that," because he thought she was cheating on him.  Uribe specifically asked whether she was cheating on him, and Doe said that she was not.  Uribe said " 'If you tell the truth, then I won't do anything.' " After Doe denied cheating on him, Uribe then said, "that's it bitch," and lunged at her.

Uribe grabbed Doe by the hair and dragged her into the hallway.  According to Doe, "[t]he next thing I knew I just remember seeing his shoe coming straight full force to my face, to my head."  Uribe "stomped on my face and knocked me out."  Doe "thought [she] was going to die."  Doe lost consciousness.

When Doe woke up, she was in the bathroom and had urinated on herself.  Uribe told Doe to get in the shower and "sort of like threw [her] in." Uribe told Doe to whisper so that the neighbors would not call the police. Uribe made her whisper for three or four hours.

Doe had a black eye that was "sealed shut" and a contusion on her stomach.  She did not call the police because she was "terrified by what already had happened."

4

The next day, June 9, Doe drove Uribe to a court date in Santa Cruz County in a criminal case arising from the July 2020 domestic violence incident.  Uribe told Doe to stay in the car and to keep her sunglasses on.

At the hearing, Uribe pleaded guilty to a violation of section 273.5, subdivision (a) based on the July 2020 incident and was placed on probation.  The court also issued a criminal protective order restraining Uribe from contacting Doe unless the contact was peaceful.  Uribe returned to the car and told Doe that he would not have to go to jail.  They went to a hotel in Santa Cruz together.

On June 10, in the hotel room, Uribe was intoxicated and again accused Doe of cheating on him.  Uribe put his hands around Doe's neck and strangled her.  He also tried to take her phone.  The incident ended when a hotel employee "bang[ed] on the door saying they were going to call the police."  Uribe left the hotel room, but Doe stayed behind and spent the night.

On June 11, Doe drove back to Concord by herself.  Beginning around 5:00 p.m., she received around 20 phone calls from a blocked number.  When Doe answered one of the calls, Uribe told her, "I'm about to be at your mom's house," and threatened to kill her, her mother, and her daughter.  Uribe used a "threatening tone," and was "[s]tern and sort of confident in his words."  Doe "believed him 100 percent" and was "scared to death."

Doe called 911.  She told the operator that Uribe "just got charged with domestic violence and now he's coming to my house and he's gonna kill my mom and—he said he was gonna kill my mom first and then me and my daughter.  And I believe him.  H—he gave me a bl—he strangled me last night.  I have a black eye from when he punched—he kicked me in the face."

Concord Police Officer Aaron Khamosh and his partner Officer Luciano responded to Doe's home.  Officer Khamosh took Doe to John Muir Hospital,

5

where she was examined by Dr. Jennifer Liu, an emergency medicine physician. Dr. Liu concluded that Doe had a black eye, a broken nose, an abdominal contusion, and had suffered a concussion.

**The Proceedings Below**

On November 8, 2021, the Contra Costa County District Attorney filed an amended information charging Uribe with willful infliction of injury on a person with whom he was in a dating relationship (§ 273.5, subd. (a)) (count 1); criminal threats (§ 422, subd. (a)) (count 2); dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)) (count 3); and disobeying a court order (§ 166, subd. (a)(4)) (count 4). The information further alleged that Uribe caused great bodily injury to Jane Doe in connection with count 1 (§ 12022.7, subd. (e)).

Trial took place over 10 days in November and December of 2021.

On December 2, the jury found Uribe guilty on each of the four counts. The jury split 5 to 7 on the great bodily injury enhancement with respect to count 1, and the court dismissed the allegation.

On January 14, 2022, the trial court sentenced Uribe to the upper term of four years on count 1, and a concurrent term of two years on count 2. The court also imposed concurrent terms of two years on count 3 and 180 days in county jail on count 4, but stayed those terms under section 654.

Uribe filed a notice of appeal.

## DISCUSSION

Uribe argues: (1) evidence of the 2009 domestic violence involving Emily C. was improperly admitted; (2) the trial court should have granted a mistrial based on certain of Doe's testimony; (3) substantial evidence does not support Uribe's conviction for criminal threats; (4) the trial court was required to instruct the jury sua sponte on unanimity on the criminal threats

6

count; (5) the jury instruction regarding the uncharged acts of domestic violence was improper and prejudicial; (6) the prosecutor committed misconduct by objecting to cross-examination regarding strangulation and then asserting that Doe was strangled in closing argument; (7) the cumulative effect of the alleged errors requires reversal; and (8) an upper term sentence on count 1 was not permitted under newly-enacted legislation requiring aggravating factors to be found true by the jury beyond a reasonable doubt.

### 1. The Trial Court Did Not Abuse its Discretion by Admitting Evidence of Uribe's Prior Acts of Domestic Violence

**Additional Background**

The prosecution moved in limine pursuant to Evidence Code section 1109 to admit evidence of both the June 2020 domestic violence incident involving Doe and the 2009 incident involving Emily C., as well as certain prior incidents involving Jane Doe in which Uribe threw a beer can at her, smothered her, and strangled her. Defense counsel cross-moved for exclusion of the evidence under Evidence Code sections 352 and 1101.

The trial court concluded that it would admit certain of the evidence:

"So, I am going to admit the 2009 incident involving [Emily C.] And the reason I'm going to admit it is that it allegedly started where he accused that victim of cheating and it turned into an extremely violent assault. And in this case involving the confidential witness in our case, the accusation of cheating was supposedly what started the whole violent episode as well.

In addition, it would not be fair for the jury to get the impression that [Jane Doe] was the only one and [Jane Doe] might be lying. I think that the jury is entitled to get a full picture of Mr. Uribe and that picture includes the fact that a completely different victim had a similar kind of extremely out of

7

the blue violent confrontation over Mr. Uribe accusing her of cheating on him. So I recognize it is getting to be kind of old, but I think that, yes, it's prejudicial, but virtually anything that comes in under Evidence Code [section] 1109 is going to be prejudicial, but in weighing the prejudice over the probative value, I think the probative value for the jury hearing that [Jane Doe] is not the only one who has suffered at Mr. Uribe's hands is extremely probative and outweighs any prejudice to Mr. Uribe, so I am allowing that in.

"As to these undated unreported incidents between Mr. Uribe and the complaining witness in this case—namely, the beer can, smothering her face to prevent her from breathing, strangling her resulting in her having trouble breathing, and slamming her face into a wall or a pillow to prevent her from breathing—I am going to exclude those. The reason for excluding them is that they become cumulative and more prejudicial than probative, especially when they aren't reported. There's apparently no medical—contemporaneous medical reports to substantiate a broken nose at that time. And, in addition, there is the much more defined prior incident in July—on July 9th of 2020, which I will allow in, which did result in a conviction, which would have been coming in any way as a conviction, so I'm going to allow that in, the July 9th, 2020, incident."

Defense counsel again objected to admission of the uncharged acts from 2009, and asked the court to reconsider. The trial court reaffirmed its decision:

"Well, I've had a lot of time to think about this since I got these motions last week and I'm letting it in for precisely the reason that the defense is going to definitely do its best to undermine any credibility of the witness in this case, and then to leave the impression that Mr. Uribe has lived a law-

abiding life and just this crazy woman came out of nowhere and made up all these allegations is not a fair representation of who Mr. Uribe is.

"In addition, the way that 2009 incident started is so similar to what [Jane Doe] says started the incident here on July 8th [*sic*], i.e. the accusation of cheating. I think it's highly relevant. And, again, there's no question that any evidence that comes in under 1109 of the Evidence Code is going to be prejudicial to the defendant, that goes without saying; but case law, a long line of case law, has said that that's not sufficient for excluding it, so I am admitting it."

**Applicable Law**

Ordinarily, evidence of prior criminal acts is inadmissible to show a defendant's disposition to commit such acts. (Evid. Code, § 1101, subd. (a).) An exception to this rule exists for cases involving domestic violence: "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1109, subd. (a)(1).)

However, "[e]vidence of acts occurring more than 10 years before the charged offense is inadmissible . . . unless the court determines that the admission of this evidence is in the interest of justice." (Evid. Code, § 1109, subd. (e).) The statute "clearly anticipates that some remote prior incidents will be deemed admissible and vests the courts with substantial discretion in setting an 'interest of justice' standard." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 539 (*Johnson*).) "[T]he 'interest of justice' exception is met where the trial court engages in a balancing of factors for and against admission under section 352 and concludes . . . that the evidence was 'more

9

probative than prejudicial.' " (*Id*. at pp. 539–540.) We review the court's ruling for abuse of discretion. (*Id*. at p. 539.)

**Analysis**

We turn first to the probative value of the uncharged incident. " ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' " (*Johnson, supra*, 185 Cal.App.4th at p. 531.) Uribe argues that the only similarity between the uncharged and charged incidents was that they both "arose from an accusation of cheating," and that because "[a]ccusations of cheating are very common in domestic violence cases," the incidents were more dissimilar than similar. We disagree.

The similarities between the incidents were not limited to the fact that both involved accusations of cheating. Both incidents began at the victim's home, while Uribe was intoxicated. In both incidents, the physical violence included Uribe dragging the victim into a bedroom, and escalated to him strangling her to the point of unconsciousness. Each victim had a black eye and bruising on her stomach.

And the probative value of the uncharged incident is increased because the evidence came from the testimony of Emily C., who did not know Doe. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*) ["[t]he probative value of evidence of uncharged misconduct also is affected by the extent to which its source is independent of the evidence of the charged offense"].)

Nor was the probative value of the evidence of the uncharged incident "substantially outweighed" by its prejudicial effect. (Evid. Code, § 352.) The primary factors affecting the prejudicial effect of uncharged acts are whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses, and whether the uncharged acts resulted in

10

criminal convictions, thus minimizing the risk the jury would be motivated to punish the defendant for the uncharged offense. (*Ewoldt*, *supra*, 7 Cal.4th at p. 405.) Here, the uncharged incident of domestic violence involving Emily C. was no more egregious or inflammatory than the charged offense, and posed no danger of confusing the jury. (See *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315.) Nor do we believe that any motivation to punish Uribe for the uncharged violence was a significant factor in this case. Uribe's plea agreement for the 2009 incident involving Emily C. was entered into evidence. Although the terms of his sentence were redacted, the agreement showed that Uribe was charged with and suffered a criminal conviction based on the 2009 incident, and the jury could infer that Uribe was punished accordingly. (See *People v. Jones* (2011) 51 Cal.4th 346, 371–372 ["The fact that defendant was convicted of the [uncharged act] reduced any prejudicial effect"]; *People v. Falsetta* (1999) 21 Cal.4th 903, 917 ["the prejudicial impact of the evidence is reduced if the uncharged offenses resulted in actual *convictions* and a prison term"].) Finally, the court instructed the jury on the limited purpose for which it could consider evidence of the 2009 incident, which "eliminated any danger 'of confusing the issues, or of misleading the jury.'" (*People v. Lindberg* (2008) 45 Cal.4th 1, 25–26.) We presume the jury followed that instruction. (*Id*. at p. 26.)

For the foregoing reasons, the trial court did not abuse its discretion in deciding the evidence of the 2009 incident was not substantially more prejudicial than probative under sections 352 and 1109, subdivision (a)(1).

**2. The Trial Court Did Not Abuse Its Discretion By Denying a Mistrial Based on Doe's Testimony**

**Additional Background**

During the prosecutor's direct examination of Doe regarding Uribe being placed on probation on June 9, 2021, the following exchange occurred:

11

"Q. And you mentioned that you were happy that he didn't have to go to jail, can you describe what you—why were you happy?

"A. Because every time he would—this is the whole reason why I would always be afraid to call the police because he'd say, you know—and he'd always remind me of all the other times he had been to prison [and] about all of his gang—

"MS. GOINS [prosecutor]: Okay. I'm going to—

"MR. MOAKLEY [defense counsel]: I'll object—

"MS. GOINS: I'll move to strike.

"THE COURT: Yes.

"MR. MOAKLEY: Yes. I'll go ahead and request an admonition to the jury and I do have a motion.

"THE COURT: So, Ladies and Gentlemen, we're going to just strike the entire last answer of Jane Doe and you are to disregard it. It's called un-ringing the bell, you are to completely disregard it and as [sic] act as if you never heard it at all and it cannot be used by you in the your [sic] deliberations at all.

"All right. Ms. Goins?

"MR. MOAKLEY: Your Honor, I'm sorry, I need a side bar.

"THE COURT: Well, why don't we go over here then.

"(Off the record conversation in chambers.)

"THE COURT: All right. [Jane Doe], I just want to remind you, you know, we have to do this whole process by question and answer.

"THE WITNESS: Okay.

"THE COURT: So you need to listen to the question, whoever's questioning you, and answer just that question. Okay?

"THE WITNESS: Okay.

"THE COURT: Don't go off on a narrative, just answer the question. Okay?

"THE WITNESS: Okay."

Later, Doe gave the following testimony on redirect examination:

"Q. After the defendant said that he was going to kill you, your mom, and your daughter, how long were you in fear after he made that statement to you?

"A. Oh. I'm still in fear.

"Q. And why are you still in fear?

"MR. MOAKLEY: I'll object, Your Honor; relevance.

"MS. GOINS: Goes to background.

"THE COURT: I think it's an element of one of the offenses so overruled.

"THE WITNESS: I'm still in fear because he—I don't know if I can say this or not, but, I mean, he—there's people outside of jail that he can obviously call or contact to do the job, so he said, for him, he doesn't have to be the one to kill me, it could be somebody else, so every day I live in fear just have to pray to God that today's not the day.

"MR. MOAKLEY: So I'm going to object, I believe that's an improper question by the prosecution, and ask that the answer be stricken and the jury be admonished to disregard it.

"MS. GOINS: Your Honor, goes to the CALCRIM and the reasonableness of the fear.

"THE COURT: The objection's overruled."

Defense counsel filed a written motion for a mistrial on November 29, 2021, arguing that Doe's references to Uribe's having been to prison and to his "gang activity" were incurably prejudicial.

After hearing argument, the trial court denied the motion for a mistrial, but offered to give the jury an admonition regarding the testimony.

The next day, the trial court admonished the jury:

"A second thing I wanted to say here is yesterday during Jane Doe's testimony, Ms. Doe made a statement to the effect that she was still afraid of Mr. Uribe, and her sustained fear of him is an element of at least one of the crimes, so that's not a problem; but she did go on to say that she feared that some people outside of jail could, quote, do the job for him.  That was not proper.  That was an inappropriate statement for Jane Doe to have made and I'm striking that comment from the record, it was commentary by Jane Doe and not relevant or appropriate testimony and you are to disregard it."

**Applicable Law**

"The court should grant a mistrial ' " 'if the court is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.  [Citation.]' [Citation.]  A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " ' (*People v. Edwards* (2013) 57 Cal.4th 658, 703. . . .)  When the trial court instructs the jury to disregard improper testimony, we review for abuse of discretion the trial court's reliance on a curative instruction in place of declaring a mistrial.  (*People v. Cox* (2003) 30 Cal.4th 916, 953 [(*Cox*)], overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, & fn. 22; *People v. Navarrete* (2010) 181 Cal.App.4th 828, 834 (*Navarrete*).)  [¶] . . . [¶]

"It has long been the rule that a reviewing court presumes the jury follows an instruction to consider only the evidence pertinent to a charged

14

crime and to disregard evidence that was admitted improperly. (*People v. Yeoman* (2003) 31 Cal.4th 93, 138 [(*Yeoman*)]; *Navarrete, supra*, 181 Cal.App.4th at p. 834.) The presumption that jurors follow instructions has been described in this regard as ' "[t]he crucial assumption underlying our constitutional system of trial by jury." ' (*Yeoman*, at p. 139.) And it is proper to accord weight to jurors' assurances they can follow the law impartially. (See, e.g., *People v. Rountree* (2013) 56 Cal.4th 823, 840–841 [crediting jurors' assurances they could be impartial despite exposure to publicity about case]; *People v. Lewis* (2008) 43 Cal.4th 415, 450 [same]; *Odle v. Superior Court* (1982) 32 Cal.3d 932, 946 [trial court is in best position to evaluate jurors' declarations of impartiality]; *People v. Mackey* (2015) 233 Cal.App.4th 32, 83–84 [same].)

"An admonition may be inadequate, however, in 'exceptional circumstances,' an inquiry that depends on the facts of the case. (*People v. Allen* (1978) 77 Cal.App.3d 924, 935 [(*Allen*)].) For example, the jury in *Navarrete* heard inadmissible evidence suggesting the defendant had confessed to the charged crime, a confession that would 'eviscerate[ ] the presumption of innocence' and that 'jurors cannot be expected to wipe from their minds.' (*Navarrete, supra*, 181 Cal.App.4th at pp. 834–835.) The matter was therefore remanded for a new trial. (*Id.* at pp. 837, 838.) Other opinions reach a similar conclusion on different facts. In one case, where the defendant was on trial for committing a lewd act on a child, a police officer testified that he had questioned the defendant about another case in which he had been a suspect. The trial court struck the statement and admonished the jury to disregard it, but the reviewing court concluded an admonition not to consider the statement did not cure the resulting prejudice, saying it 'was no antidote for the poison that had been injected into the minds of the jurors.

15

The defendant stood as one who had been accused of some other sex offense.' (*People v. Bentley* (1955) 131 Cal.App.2d 687, 689–691, disapproved on another ground in *People v. White* (1958) 50 Cal.2d 428, 430–431.) The same result was reached in *People v. Allen*, an 'extremely close case' that depended on the credibility of the defendant and other witnesses. (*Allen*, at pp. 934–935.) The reviewing court there concluded an admonition did not cure improper testimony that the defendant was on parole. And in *People v. Schiers* (1971) 19 Cal.App.3d 102, 108–109, the court found improper testimony that a lie detector test showed the defendant was lying to be incurably prejudicial.

"In other circumstances, cases have held that brief, isolated, or ambiguous references to inadmissible matter did not cause incurable prejudice. (See, e.g., *People v. Collins* (2010) 49 Cal.4th 175, 197–199 ['brief and ambiguous' testimony that defendant made collect calls from 'Susanville' before he ' "got out" ' could be cured by admonition]; *People v. Valdez* (2004) 32 Cal.4th 73, 128 ['brief and isolated' reference to ' "Chino Institute" ' did not require mistrial]; *People v. Bolden* (2002) 29 Cal.4th 515, 555 [brief and fleeting reference to parole office].) And, significantly, our high court has noted the importance of a *timely* admonition to cure prejudice when a jury hears inadmissible evidence. (*Cox, supra*, 30 Cal.4th at p. 953 [erroneously offered polygraph evidence].)" (*People v. Turner* (2021) 73 Cal.App.5th 117, 127–129 (*Turner*).)

**Analysis**

We do not find any abuse of discretion in the trial court's decision to give a curative instruction in place of declaring a mistrial with respect to Doe's testimony. Doe's statement regarding "all the other times [Uribe] had been to prison" was brief and ambiguous, as well as unsupported by any

16

other testimony or evidence.  Doe did not even finish her sentence regarding "all of his gang—" before defense counsel objected.  In addition, the jury was immediately and forcefully admonished to "completely disregard" the testimony and to "act as if you never heard it at all," and warned that "it cannot be used by you in . . . your deliberations at all."  Uribe has offered no reason to depart from the presumption that the jury followed these instructions and disregarded the testimony.  (See *Yeoman*, *supra*, 31 Cal.4th at p. 138.)

The second reference to inadmissible matter was even more brief, fleeting, and ambiguous.  Doe did not state that Uribe had been to prison, was in prison, or that he was a member of a gang—she stated that "there's people outside of jail that he can obviously call or contact to do the job."  And again, the jury was promptly admonished that the testimony was "inappropriate," "not proper," and that it should be disregarded.  The trial court did not abuse its "considerable" discretion in concluding that these were not the type of "exceptional circumstances" in which Uribe's chances of receiving a fair trial had been "irreparably damaged."[2]  (*Turner*, *supra*, 73 Cal.App.5th at pp. 127, 128.)

---

[2] For similar reasons, we reject Uribe's argument that the prosecutor committed prejudicial misconduct based on the rule that "[a] prosecutor has the duty to guard against statements by his witnesses containing inadmissible evidence." (*People v. Warren* (1988) 45 Cal.3d 471, 481–482.) Even if the prosecutor should have, but did not, warn Doe against referencing Uribe having been in prison, Doe's testimony did not " ' " ' "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process," ' " ' " nor was it " 'reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (See *People v. Wallace* (2008) 44 Cal.4th 1032, 1070–1071.)

17

### 3. Substantial Evidence Supports the Conviction for Criminal Threats, and an Instruction on Unanimity Was Not Required

#### Additional Background

The amended information alleged that "[o]n or about June 11, 2021, in the County of Contra Costa, State of California, the crime of Criminal Threats in violation of PC422(a), a Felony, was committed in that JOSHUA URIBE did willfully and unlawfully threaten to commit a crime which would result in death and great bodily injury to [Jane Doe], with the specific intent that the statement be taken as a threat."

Uribe focuses on Doe's testimony in support of this charge, which was in part as follows:

"[MS. GOINS:] . . . Q. Okay. So on June 11th, 2021, did you start receiving calls from blocked numbers?

"A. Yes.

"Q. Was that around 5:00 o'clock p.m. in the afternoon?

"A. I believe so.

"Q. Okay. Was there a time period that you answered one of those private numbers?

"A. Yes.

"Q. Okay. And who was on the other line?

"A. Joshua Uribe.

"Q. What did he say to you at that time period?

"A. He said, 'I'm right down the street,' but—first he said 'I'm right down the street from your mom's house,' and my mom, who is elderly, and I believed him, I mean, he said—can I keep going?

"Q. So after he said he was right down the street, do you remember specifically what he stated to you on June 11th, 2021?

18

"A. He just said—I believe it was along the lines of, 'I'm going to—I'm about to be at your mom's house and,' you know, 'and I'm going to murder your mom, I'm going to murder your daughter.'

"Q. Did he say anything else?

"A. I think he—you know, I mean, I think—if can I look at the report again?

"Q. Would that refresh your recollection as to what you told the officers on the date of the incident?

"A. Yes. Yes.

"Q. Okay. I'm going to refer you to this paragraph here. I want you to read it to yourself silently and then look up when you're done.

"A. (Reading document.)

"Q. Okay. Did you have the opportunity to read your statement in the police report?

"A. Yes.

"Q. Did that refresh your recollection about what the defendant specifically stated to you on June 11th, 2021?

"A. Yes.

"Q. And what was that?

"A. He said, 'I'm going to kill your mom and your daughter, wait until tonight, wait until tonight.'

"Q. Did he ever threaten to kill you?

"A. Not at that moment.

"Q. Okay. Any time during that conversation did he threaten to kill you?

"A. Not that I—I don't think so, I don't remember.

"Q. You don't remember. Do you remember calling 9-1-1 that day?

19

"A. Yes.

"Q. Do you remember telling the dispatcher that he had threatened to kill you, your mom, and your daughter?

"A. Yes.

"Q. Was that the truth?

"A. Yes.

"Q. Okay. Can you tell us why it's hard to remember exactly what happened on—or exactly what was said on June 11th, 2021?

"A. Why it's hard to remember?

"Q. Yes. Why are you having some difficulty remembering the exact words?

"A. I guess I'm just trying to—I guess my brain has blocked it out, I don't know. I mean, I just—it's just I think also from the injury itself. [¶] . . .[¶]

"MR. MOAKLEY: And I would object to the latter portion of that answer, ask that it be stricken.

"THE COURT: I'm not going to strike it. I mean, I believe she believes that's part of her difficulty here, so I'm going to leave it.

"MS. GOINS:

"Q. Can you describe the defendant's tone when he threatened to kill you, your mom, and your daughter?

"A. Yeah, it was a threatening tone for sure.

"Q. What do you mean when you say threatening tone?

"A. Stern and sort of confident in his words. I believed him 100 percent.

"Q. Was he angry when he said it to you?

"A. Yes.

"Q. How did it make you feel when you heard this?

"A. Scared to death."

**Applicable Law**

"The law governing sufficiency-of-the-evidence challenges is well established . . . . [Citations.] In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.) In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

**Analysis**

Uribe argues that Doe's testimony does not support his conviction for making criminal threats to her personally on June 11, because when asked "Did he ever threaten to kill you?" She responded, "Not at that moment," and when asked "Any time during that conversation did he threaten to kill you?"

21

She responded, "Not that I—I don't think so, I don't remember." But after being reminded of her call to 911, Doe testified that she told the 911 operator that Uribe had threatened to kill her as well, and that what she told the operator was the truth. The audio of the 911 call, where Doe repeatedly stated that Uribe had threatened to kill her as well as her mother and daughter, was also entered into evidence. The jury could permissibly credit the portion of Doe's testimony where she clarified that Uribe threatened to kill her, as well as the audio of the 911 call, which provide substantial evidence in support of the conviction:

" 'It [was] for the [jury] to consider internal inconsistencies in [Doe's] testimony, to resolve them if [that was] possible, and to determine what weight should be given to such testimony.' [Citation.]" (*Davis v. Foster Wheeler Energy Corp.* (2012) 205 Cal.App.4th 731, 736.) Moreover, the jury was permitted to "believe and accept a portion of the testimony of [Doe] and disbelieve the remainder. [Citation.]" (*People v. Chavez* (1968) 268 Cal.App.2d 381, 383.) When applying the substantial evidence test, we must uphold a judgment even if the evidence supporting it is contradicted. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874.) As a result, the substantial evidence test requires us to accept any portion of Doe's testimony that supports the judgment. The audio of Doe's 911 call, together with her testimony that she told the 911 operator that Uribe threatened to kill her and that was the truth, provide ample substantial evidence in support of Uribe's conviction for criminal threats.[3]

_____

[3] In light of this conclusion, we need not consider Uribe's further argument that the jury should have been given an unanimity instruction requiring it to agree that either (1) Uribe made threats against Doe on July 9,

22

### 4. The Trial Court's Limiting Instruction Regarding the Uncharged Domestic Violence Was Not Prejudicial

**Additional Background**

The trial court instructed the jury, pursuant to CALCRIM No. 852A[4]:

"The People presented evidence that the defendant committed domestic violence that was not charged in this case.  Specifically, there was evidence that the defendant punched, dragged, and strangled Emily [C.] causing injuries on September 18th, 2009; and on July 9th, 2020 [*sic*], the defendant put his hands around Jane Doe's neck and shoved her into the side of the car causing Jane Doe's nose to bleed.  [¶] . . .[¶]

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged domestic violence.  [¶] . . . [¶]

"If you decide the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence, and based on that decision, also conclude that the defendant was likely to commit and did inflict a traumatic injury on former cohabitant, person with whom he had a past dating relationship, Jane Doe, on June 8th, 2021, as charged here.

"If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence.

---

2020, or (2) Uribe made threats against Doe's mother and daughter on June 11, 2021.

[4] The standard form of CALCRIM No. 852A provides:

"The People presented evidence that the defendant committed domestic violence that was not charged in this case[, specifically: <insert other domestic violence alleged>.]"

"It is not sufficient by itself to prove that the defendant is guilty of inflicting a traumatic injury to a former cohabitant, person with whom he had [a] dating relationship, paren, Jane Doe, close paren, on June 8th, 2021. The People must still prove each charge beyond a reasonable doubt."

Defense counsel objected to the instruction as given, in particular its description of the uncharged acts, and argued that it would be sufficient to describe the uncharged domestic violence only by reference to the names of the victims and the dates, i.e., that "there was evidence that the defendant assaulted Emily [C.] on September 18th, 2009, and on July 2020 [*sic*], that the defendant assaulted Jane Doe." Uribe argues that the instruction as given was prejudicial in that it endorsed Doe's version of events and inflamed the passions of the jury.

**Applicable Law**

" 'The touchstone of due process is fundamental fairness.' (*Salas* [*v. Cortez* (1979)] 24 Cal.3d [22,] 27; see *Gagnon v. Scarpelli* (1973) 411 U.S. 778, 790 ['[F]undamental fairness[is]the touchstone of due process'].) A jury instruction may ' "so infuse[ ] the trial with unfairness as to deny due process of law." ' (*Estelle v. McGuire* (1991) 502 U.S. 62, 75 (*Estelle*).) However, ' "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is ' "whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." ' " ' (*People v. Mills* (2012) 55 Cal.4th 663, 677 [(*Mills*)], quoting *Estelle*, p. 72.) ' "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." ' ([*People v.*] *Foster* [(2010)] 50 Cal.4th [1301,] 1335, italics omitted; see *People v. Haskett* (1990) 52 Cal.3d 210, 235.) ' "If the charge as a whole is ambiguous, the question is whether

24

there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' (*Mills*, at p. 677.)" (*People v. Lemcke* (2021) 11 Cal.5th 644, 655.)

**Analysis**

We do not agree that the instruction as given was prejudicial. The instruction did not provide any authoritative version of events, but instead stated that "[t]here was evidence" that Uribe "punched, dragged, and strangled Emily [C.]" and "put his hands around Jane Doe's neck and shoved her into the side of the car causing [her] nose to bleed." Indeed, Emily C. testified that Uribe "punch[ed] me in the face and on the body," "grabbed my arm and drug me into the bedroom," and "started to strangle me." Ito testified that Uribe "placed both hands in the collar bone region of [Doe]'s neck and shoved her backwards into the driver door," and photographs of Doe's bloody nose were shown to the jury. The instruction simply provided a brief summary of certain of the evidence.

In addition, considering the instructions as a whole, we do not find any possibility that the instruction "endorsed Doe's version of events" so as to render Uribe's trial fundamentally unfair. The challenged instruction told the jury that it could consider the evidence of the uncharged domestic violence "only if the People have proved [it] by a preponderance of the evidence," that if it had, "you may, but are not required to, conclude from the evidence that the defendant was disposed or inclined to commit domestic violence," that "that conclusion is only one factor to consider along with all the other evidence," and that even if they reached that conclusion, the prosecution "must still prove each charge beyond a reasonable doubt." In another instruction, the trial court told the jury: "Do not assume just because I give a particular instruction that I'm suggesting anything about the facts.

25

After you've decided what the facts are, follow the instructions that do apply to the facts as you find them." Before trial, the court instructed the jury that it should "not take anything I say or do during the trial as an indication of what I think about the facts, the witnesses or what your verdict should be." The trial court also told the jury that "[y]ou must decide what the facts are. It is up to . . . all of you and you alone to decide what happened based only on the evidence that has been presented to you in this trial." And the court repeatedly reminded the jury of the prosecution's burden to prove each charge beyond a reasonable doubt. In sum, we do not find any possibility that the challenged instruction, when considered in context, endorsed the prosecution's version of events so as to infect Uribe's trial with unfairness.

**5. There Was No Prejudicial Prosecutorial Misconduct in the Evidence and Closing Argument Regarding Strangulation**

**Additional Background**

Doe testified that Uribe strangled her at a hotel in Santa Cruz on June 10, 2021. When Doe called 911 on June 11, 2021, she twice told the operator that Uribe had strangled her the night before.

Officer Aaron Khamosh testified on cross-examination that he met with Doe on June 11, and that he did not observe any ligature or hand marks on her neck, nor did he observe her having any difficulty breathing.

Dr. Jennifer Liu examined Doe in the emergency room at John Muir Hospital in Concord on the night of June 11. Doe had a black eye and a broken nose. On cross-examination, defense counsel asked, "You did not observe [Jane Doe] having any difficulty breathing, did you?" The prosecutor objected "as relevance," and the trial court sustained the objection.

Later on, outside the presence of the jury, defense counsel said the following:

"MR. MOAKLEY: I did want to memorialize an issue that came up during the cross-examination of the expert this morning. I had a line of questions about the doctor's observations of [Jane Doe's] neck and the possible signs of strangulation, as I'm sure Court and counsel recall, [Jane Doe] did allege and did testify in court that Mr. Uribe had strangled her the night before. That line of questioning was promptly objected to on relevance grounds and that objection was sustained. By offer of proof, I believe that the witness would have testified that [Jane Doe] exhibited normal breathing; that she did not observe any bruising or ligature marks; that [Jane Doe] was able to fully move her neck; and that in the CAT scan—or CT scan of the witness' [sic] neck, the witness did not observe any acute processes, in other words, any injuries to [Jane Doe's] neck. I do think that the prosecution put that particular claim at issue, I ought to have been able to explore it on cross-examination.

"In terms of a remedy, I could offer those portions of the medical records and ask they be admitted in evidence for me to argue the points to the jury. I could send those pages to Court and counsel by close of business today.

"THE COURT: Well, my notes—my notes are all about the alleged strangulation being not that day. Also, there was a lot of discussion about May 13th and that was when he supposedly strangled her around—either on that day or around that day. I don't have notes that she testified he strangled her on June 8th of 2021.

"MR. MOAKLEY: The allegation, Your Honor, is that he strangled her in Santa Cruz on June 10th before she came back to Concord on June 11th. So the fact that she had no indications having being [sic] strangled even from a CT scan the following day I think would be relevant to whether that

27

particular allegation is true and then by extension, whether [Jane Doe's] claims in general are true.

"I believe this would be one, perhaps two pages of the medical records, it would not be cumulative. I believe also under the rule of completeness, it would be appropriate to admit that additional portion of the records.

"THE COURT: Ms. Goins?

"MS. GOINS: I don't remember that testimony going how Mr. Moakley is representing to the Court. I do believe that the witness did testify that there—that she did not notice that [Jane Doe] was having any trouble breathing and that came into evidence.

"As far as the actual strangulation is concerned, there was no allegation, as the Court has already stated, that she was strangled on June 8th, 2021, and that was not a portion of the doctor's diagnosis that she told the Court. And that's in People's Exhibit 46.

"I would also agree that the strangulation—that [Jane Doe] stated that she was strangled two days prior to May 13th, which is well before June 11th where she was evaluated by Dr. Liu in the emergency department.

"At this point, I would object to any furtherance of the medical records coming in because what we have now is we have a record from a police officer who testified—that's not a doctor, that he testified that strangulation—he testified as an expert essentially on strangulation without actually saying he was an expert, and there were no questions about that from the actual doctor who could have testified about the signs and symptoms of strangulation and whether or not there can be no external signs of strangulation and a strangulation have occurred.

"So I will stand by the Court's initial ruling in sustaining my objection and I'll just submit on those points.

28

"MR. MOAKLEY: Just to specify, the grounds of my objection would be due process and confrontation rights under the State and Federal constitutions.

"THE COURT: Well, I don't have in my notes that she testified that he strangled her in the recent time to that doctor's visit. And she never—she didn't say that she was strangled on June 8th of 2021, she said that he stomped on her face, so I don't think that it's a due process violation that you could not get into it more with Dr. Liu. As it is, you did get into it with Dr. Liu to a certain extent and you did extensive cross-examination of Dr. Liu and got in quite a bit of information, so it's not like the Court deprived you of cross-examining Dr. Liu and getting into evidence about that. So your objection's noted, but I'm not allowing you to reopen."

Later, during closing argument, the prosecutor twice argued that Uribe had strangled Doe in Santa Cruz on June 10, 2011.

During the subsequent lunch break, defense counsel e-mailed the court and counsel to request a mistrial based on the prosecutor's argument regarding the alleged strangulation. Defense counsel requested a mistrial based on the "improper argument and prosecutorial misconduct," and went on that "[s]hould that request be denied and the argument be permitted to stand, I am renewing my request to offer the evidence of the CT scan of [Jane Doe]'s neck. Please find attached the relevant page from the medical records. I would also request that the Court admonish the jury of Ms. Goins'[s] misconduct and instruct them that they may infer reasonable doubt from that issue."

When the trial resumed and after discussion of the motion, the trial court told the prosecutor: "I made rulings based on that and now you're arguing as if that were a fact that you proved. So at this stage of the game,

29

I'm not going to declare a mistrial," and "I'm not going to find prosecutorial misconduct," but the court indicated that it would allow defense counsel to introduce the CT scan.

The trial court then instructed the jury as follows:

"THE COURT: . . . Ladies and Gentlemen, I'm going to be allowing the defense to introduce a new exhibit even at this late stage, Defendant's D, and I have to explain why I'm doing this.

"So yesterday when Dr. Liu was on the stand, there were some questions by [defense counsel] about signs of strangulation on [Jane Doe]. There had been an objection to that line of questioning by [the prosecutor] and I sustained the objection.

"Based on the arguments so far today, I believe that my ruling might have been somewhat in error. I had looked at my notes of Dr. Liu's testimony—not Dr. Liu's testimony, of [Jane Doe's] testimony and I did not believe—I did not have in my notes comments by her about strangulation in the days right around June 2021, so I disallowed the questioning.

"But, based on what has happened this morning, I now realize that the Court's notes were incorrect and my ruling was probably incorrect yesterday. So to try and correct that, I am permitting at this stage that the defense can introduce Defendant's D and it will be admitted. It is a page of the same medical records that are in as [Exhibit] 46, I believe, and it has to do with a CT scan of [Jane Doe's] neck area, and the gist of it is that there was no acute injury observed on the CT scan. So that will be admitted. That will go into the jury room with you."

Later, as part of his closing argument, defense counsel argued that the evidence did not support Doe's claim that she was strangled by Uribe on June 10:

"If you recall, [Jane Doe] said that she was strangled by Mr. Uribe the day before. And as you can see from this record, the CT scan was done because of a clinical history, a report [*sic*] neck pain, assault, strangulation. You can see the findings, you can see the impression for yourself. No injury to her neck. You'll also see in the notes of the general exam that Dr. Liu performed, which is already in evidence, that [Jane Doe] reported no difficulty breathing and no pain in her neck. She was able to move her neck."

**Applicable Law**

" '[O]n claims of prosecutorial misconduct our state law standards differ from those under the federal Constitution.' (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070.) Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.) By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' (*People v. Price* (1991) 1 Cal.4th 324, 447) and ' "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct" ' (*People v. Wallace, supra*, 44 Cal.4th at p. 1071)." (*People v. Davis* (2009) 46 Cal.4th 539, 612.)

"Even where a defendant shows prosecutorial misconduct occurred, reversal is not required unless the defendant can show he suffered prejudice. (*People v. Arias* (1996) 13 Cal.4th 92, 161.) Error with respect to prosecutorial misconduct is evaluated under the standards enunciated in *Chapman v. California* (1967) 386 U.S. 18, 24, to the extent federal constitutional rights were implicated, and under *People v. Watson* (1956) 46 Cal.2d 818, 836, to the extent only state law issues were involved.

(*People v. Herring* (1993) 20 Cal.App.4th 1066, 1074.)  The federal standard is implicated where the prosecutor's conduct renders the trial so fundamentally unfair that due process is violated.  (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214–1216; *People v. Harris* (1989) 47 Cal.3d 1047, 1084.)  The state standard applies where the prosecutor uses ' " ' "deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' (*People v. Gionis*, *supra*, at p. 1215; see also *People v. Roldan* (2005) 35 Cal.4th 646, 719.)"  (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 514–515.)

**Analysis**

Uribe argues that by objecting on relevance grounds to defense counsel's cross-examination of Dr. Liu regarding evidence of strangulation, and then arguing to the jury that Doe was in fact strangled, the prosecutor committed misconduct.  But even assuming these actions constituted misconduct, Uribe has failed to demonstrate any prejudice.

Plainly, the alleged misconduct did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643; *People v. Hill* (1998) 17 Cal.4th 800, 819.)  The prosecutor argued to the jury that Uribe committed the domestic violence alleged in count 1 based on the events of June 8 alone, and mentioned the strangulation while giving an overview of all the facts, and again while discussing the criminal threats count.  Apart from how it reflected on Jane Doe's credibility in general, Uribe has not explained how whether Uribe strangled Doe on June 11 was relevant or necessary to any of the counts of conviction.  And it is not reasonably probable that a different result would have been reached absent the alleged misconduct.  (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)  At worst, the alleged misconduct prevented defense counsel from fully cross-examining Dr. Liu about whether

she found signs of strangulation when she examined Doe on June 11. But as a remedy, the trial court explained what had happened to the jury, and permitted defense counsel to introduce the CT scan into evidence, telling the jury that the "gist of it is that there was no acute injury observed." And defense counsel later argued to the jury that the CT scan showed no injury to Doe's neck. Uribe has failed to demonstrate any prejudice from the alleged prosecutorial misconduct.

### 6. There Was No Cumulative Prejudice

Finally, Uribe argues that the cumulative effect of the errors he alleges denied him due process under the Fourteenth Amendment. "As we have found no substantial error in any respect, this claim must be rejected." (*People v. Butler* (2009) 46 Cal.4th 847, 885.)

### 7. After *Lynch*, Remand for Resentencing Is Required

#### Additional Background

As noted, the trial court sentenced Uribe to the upper term of four years in prison on count 1. The court imposed a concurrent term of two years in prison for criminal threats (count 2). The court also imposed concurrent terms of two years in prison for witness dissuasion (count 3) and 180 days in county jail for violation of a court order (count 4), but stayed those terms under section 654.

The court gave the following explanation of its sentencing decision on count 1:

"THE COURT: . . . Having said that, so Penal Code Section 1170 has been amended and effective January 1st of this year, which does provide to a sentencing Court that the default in felony cases should be mid-term of any triad listed in the Penal Code, unless certain things—unless under 1170[, subdivisions] (b)(2) and (b)(3) there were facts stipulated to by the defendant

33

or submitted to the jury for—or the trier of fact, I should say, and proved beyond a reasonable doubt.

"An exception to that is exactly what Ms. Goins mentioned under [section] 1170[, subdivision] (b)(3) and consistent with prior case law is the prior conviction exception, which is case law has routinely held that prior convictions do not necessarily have to be presented to the jury.

"In this case, however, they actually were. The ones that I'm considering, they actually were presented to the jury.[5] And although the jury did not have to make findings on them, the evidence was presented there. So, even under the amended [section] 1170, the Court can consider prior convictions based on certified records of convictions. The Court can, under the same prior conviction exception, consider what type of prior conviction a defendant has. And that's *People* [*v.*] *Cardenas* [(2007)] 155 Cal.App.4th 1468. The Court can consider the criminal record of a person is becoming increasingly more serious.

"The Court can, even under prior case law, still consider as an aggravating circumstance defendant's prior unsatisfactory performance on probation, parole, mandatory supervision, or what have you. And that's under *People* [*v.*] *Towne* [(2008)] 44 Cal.4th 63. So the Court is not going to give the mid-term. The Court is also finding that Mr. Uribe is not appropriate for probation.

"In determining the sentence I'm about to impose, which is four years, which is the aggravated term on the [section] 273.5, Count 1, the Court has considered the factors about rendering—the factors in determining whether

---

[5] According to the prosecution's sentencing brief, Uribe had several other prior convictions, but the trial court did not consider them for sentencing purposes.

34

probation is appropriate under [California Rules of Court, rule] 4.414[6], and the factors in aggravation under [rules] 4.421 and 4.423.

"The factors in determining whether a person should get probation under [rule] 4.414, in looking at those factors under [rule 4.414](a), factors relating to the crime, or crimes, they are very serious. The Court does deem that [Jane Doe] was—was and is a vulnerable victim. Mr. Uribe did inflict physical and emotional injury on [Jane Doe]. He was not just a passive participant, he was a very active participant. And also he took advantage of a position of trust. The very nature of domestic violence is that the perpetrator is taking advantage of a position of trust.

"Under [rule 4.414](b) relating to the defendant in question, there is a pattern of criminal conduct, specifically domestic violence, as evidenced by his record. His prior performance on probation has been poor. The Court has not seen one scintilla of evidence that Mr. Uribe has remorse. And he is very much a danger to [Jane Doe] if he is not in prison. He is, therefore, under [r]ule 4.414 not an appropriate candidate for probation.

"Under [r]ule 4.421, the circumstances in aggravation, these are—a lot of these are repetitive. With regards to the crime under [rule 4.421](a), there was great violence. It's true the jury hung on the issue of great bodily injury, but the testimony was that she lost consciousness, that she had, as I recall, a nasal fracture.

"MS. GOINS: Correct.

"THE COURT: Certainly injuries indicative of a crime of violence.

"Under [rule 4.421](6), Mr. Uribe threatened the witness. And that's evidenced by the jury's conviction on Count 3.

---

6 Further references to rules are to the California Rules of Court.

"Under [rule 4.421](7), he was convicted of other crimes on which he could get consecutive sentences, but I'm going to choose to give them concurrent.

"The manner—under [rule 4.421](8), the manner of the crime shows sophistication, specifically the strangling. [Jane Doe] testified that he strangled her, she lost consciousness, and when she came-to, she was in a completely different room in the house and had lost control of bodily functions. And again, position of trust—he was in a position of trust.

"Factors in aggravation relating to Mr. Uribe himself, under [rule 4.421](1), he engaged in violent contact. Under [rule 4.421](2), he has numerous prior convictions for exactly the same type of conduct.

"[Rule 4.421](3), he has served a prior prison term in 2011 with regards to Ms. Clarke, who testified in this case. He was originally granted probation, failed miserably, and ended up in prison.

"[Rule 4.421](4), he was on probation. As to Count 2, the criminal threats conviction, on June 11th, he had just been placed on probation out of Santa Cruz County two days before.

"Under [rule 4.421](5) of that rule, as I've indicated before, his prior performance on probation has been exceedingly poor.

"Under [r]ule 4.423, circumstances in mitigation, under [rule 4.423](a), I don't find that there are any factors under [rule 4.423](a) that are in mitigation.

"As to [rule 4.423](b) regarding the defendant's characteristics, again I find no delineated factors apply to Mr. Uribe.

"I've also considered [r]ule 4.425 in determining whether to run sentences consecutive or concurrently. Clearly, the Court could—and the District Attorney is arguing that I should—impose a full term consecutive

sentence on—a full mid-term consecutive sentence for the [section] 422. It's clear the [section] 422, which happened a few days later, from the main charges had a completely separate objective and the Court could certainly legally impose a consecutive sentence, but is choosing not to.

"For all of these reasons, the Court is—finds that the upper term of four years on Count 1 is an appropriate sentence in this case, and I will sentence Mr. Uribe to four years as to Count 1."

**Applicable Law**

Effective January 1, 2022, Senate Bill No. 567 (2021–2022 Reg. Sess.), amended section 1170, subdivision (b), in a number of respects, one of which was to make the middle term of imprisonment the presumptive sentence. (See § 1170, subd. (b)(2), as amended by Stats. 2021, ch. 731, § 1.3.) Under the amended statute, "[W]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (§ 1170, subd. (b)(1).) "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime . . . and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) However, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).)

The aggravating factors relating to the crime, as relevant here, include that: "(1) The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty,

37

viciousness, or callousness; [¶] (3) The victim was particularly vulnerable; [¶] (4) The defendant induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants in its commission; [¶] (6) The defendant threatened witnesses, unlawfully prevented or dissuaded witnesses from testifying, suborned perjury, or in any other way illegally interfered with the judicial process; [¶] (7) The defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed; [¶] (8) The manner in which the crime was carried out indicates planning, sophistication, or professionalism; [¶] (11) The defendant took advantage of a position of trust or confidence to commit the offense." (Rule 4.421(a).) The aggravating factors relating to the defendant include that: "(1) The defendant has engaged in violent conduct that indicates a serious danger to society; [¶] (2) The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness; [¶] (3) The defendant has served a prior term in prison or county jail under section 1170[, subdivision] (h); [¶] (4) The defendant was on probation, mandatory supervision, postrelease community supervision, or parole when the crime was committed; and [¶] (5) The defendant's prior performance on probation, mandatory supervision, postrelease community supervision, or parole was unsatisfactory." (Rule 4.421(b).)

**Analysis**

In our previous opinion, we began our discussion of Uribe's sentencing argument as follows:

"The Courts of Appeal are divided on the applicable standard for assessing prejudice from error under Senate Bill No. 567, and the issue is pending before our Supreme Court. (*People v. Lynch* (May 27, 2022,

38

C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942; see *People v. Flores* (2022) 75 Cal.App.5th 495, 500–501 [concluding that remand for resentencing is unnecessary if the reviewing court can determine beyond a reasonable doubt that the jury would have found true at least one aggravating factor].) In the meantime, in *People v. Wandrey* (2022) 80 Cal.App.5th 962, 981 (*Wandrey*), review granted and dismissed Aug. 30, 2023, S275942, our Division chose to follow the test set forth in *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*):

" 'To determine whether prejudice resulted from a trial court's failure to apply the new version of the sentencing law [under Senate Bill No. 567], we first ask "whether the reviewing court can conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt all of the aggravating factors on which the trial court relied in exercising its discretion to select the upper term. If the answer to this question is 'yes,' then the defendant has not suffered prejudice from the court's reliance on factors not found true by a jury in selecting the upper term. However, if the answer to the question is 'no,' we then consider the second question, which is whether a reviewing court can be certain, to the degree required by *People v. Watson* [(1956) 46 Cal.2d 818, 836], that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied. If the answer to both of these questions is 'no,' then it is clear that remand to the trial court for resentencing is necessary." (*Lopez, supra*, 78 Cal.App.5th at p. 467, fn. 11, italics omitted.)' (*People v. Ross* (2022) 86 Cal.App.5th 1346, 1354–1355,

39

review granted Mar. 15, 2013, S278266.)" (*Uribe, supra*, A164502, pp. 38–39.)

We noted that "[t]he Attorney General concedes that the trial court improperly relied on certain aggravating factors that were not found true by the jury: that Uribe committed a crime of great violence, that the manner of the crime demonstrated sophistication, that Uribe took advantage of a position of trust, and that Uribe was on probation at the time of the offense, which was not true for the June 8, 2021 domestic violence charged in count 1.[7] However, the Attorney General argues that any error was harmless." (*Uribe, supra*, A164502, pp. 39–40.) Applying the test for prejudice adopted in *Wandrey* and *Lopez*, we agreed that the error was harmless because the trial court relied on other aggravating factors that were proved in compliance with Senate Bill No. 567, and "given that the trial court was aware of the presumption in favor the middle term established by Senate Bill No. 567, and the fact that the court found no mitigating circumstances with respect to the crime or Uribe himself, Uribe's arguments that the trial court should have evaluated the aggravating circumstances differently do not establish a reasonable probability that the trial court would impose the middle term on remand." (*Uribe, supra*, A164502, pp. 40–42.)

On December 28, 2023, our Supreme Court granted and held Uribe's petition for review pending its decision in *Lynch*. (*Uribe, supra*, A164502, review granted Dec. 28, 2023, S282387.)

On August 1, 2024, our Supreme Court decided *Lynch*, holding that under section 1170, subdivision (b) as amended by Senate Bill No. 567, "a

---

[7] As noted, Uribe was placed on probation for the July 2020 domestic violence against Jane Doe on June 9, 2021.

Sixth Amendment violation occurs when the trial court relies on unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have been properly established.  The violation is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true all of the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements.  If the reviewing court cannot so determine, applying the *Chapman* [*v. California* (1967) 386 U.S. 18] standard of review, the defendant is entitled to a remand for resentencing." (*Lynch*, *supra*, 16 Cal.5th at p. 768.)  In so doing, the Supreme Court expressly disapproved *Lopez*, *supra*, 78 Cal.App.5th 459, 467, fn. 11.  (*Lynch*, *supra*, 16 Cal.5th at p. 769.)

On December 18, 2024, the Supreme Court transferred the case to this court and directed us to vacate our decision and reconsider the cause in light of *Lynch*.  (Cal. Rules of Court, rule 8.528(d).)  And on December 30, Uribe's counsel filed a supplemental brief arguing that he is entitled to a remand for resentencing under that decision.

We agree that, after *Lynch*, Uribe is entitled to a remand for resentencing.  As noted, and as previously conceded by the Attorney General, in imposing the upper term the trial court relied on several aggravating factors not found true by the jury, and we cannot conclude beyond a reasonable doubt that the jury would have found true all those aggravating factors, including "that Uribe committed a crime of great violence," and "that the manner of the crime demonstrated sophistication."  (*Uribe*, *supra*, A164502, pp. 39–40.)

The Attorney General does not argue otherwise.  On January 7, he filed a supplemental brief, arguing instead that Uribe's claim of sentencing error

41

is moot because he has already served the sentence imposed.[8] The Attorney General argues that Uribe's claim is moot because excess custody credits could not be used to reduce any outstanding fines or fees as no such fines or fees were imposed on account of Uribe's inability to pay, and that Uribe's claim of sentencing error does not present a question of continuing public interest. His brief does not discuss the potential impact of resentencing on Uribe's parole term.

On January 9, Uribe's counsel filed a short reply brief, representing that Uribe is still on parole and arguing that his appeal is not moot because a reduction in his sentence would reduce his parole period. We agree.

An appeal becomes moot when events have rendered it impossible for an appellate court to grant effective relief. (*Becerra v. McClatchy Co.* (2021) 69 Cal.App.5th 913, 927, fn. 4.) "Generally, the burden is on the party claiming mootness to establish that an appeal is moot." (*Ibid.*)

"A criminal case should not be considered moot where a defendant has completed a sentence where . . . the sentence may have 'disadvantageous collateral consequences.' " (*People v. Ellison* (2003) 111 Cal.App.4th 1360, 1368–1369.) Even if he was released from prison in July 2023 as represented by the Attorney General, Uribe is apparently still on parole, and if he violates the terms of that parole, he would again be exposed to a state prison

---

[8] In support of his claim that Uribe has served his sentence, the Attorney General states that Uribe "does not appear on the California Department of Corrections's website, available at https://ciris.mt.cdcr.ca.gov /search (last visited Jan. 2, 2025)." In his original respondent's brief, the Attorney General stated that "[Uribe]'s counsel has represented that [he] is scheduled to be released from prison in July 2023." Uribe's original reply brief did not respond to this assertion regarding the date of Uribe's release from prison, and other than asserting that he is "still on parole," his supplemental briefing on remand does not address it either.

sentence.  (See *People v. Ellison*, *supra*, 111 Cal.App.4th at p. 1369.)  If this court grants Uribe relief by remanding the matter for resentencing, it is possible he would receive a shorter sentence, which, in turn, could affect the length of time he would remain on parole.  (See *People v. Morales* (2016) 63 Cal.4th 399, 405 [recognizing "long-established rule" that "excess presentence credits can reduce any period of parole"]; §§ 1170, subd. (a)(3) & 2900.5, subds. (a), (c); see also Cal. Code Regs., tit. 15, § 2345.)  Under these circumstances, the appeal is not moot.  (See *People v. Ellison*, *supra*, 111 Cal.App.4th at p. 1369; *People v. Planavsky* (1995) 40 Cal.App.4th 1300, 1305, fn. 8; *People v. Goodson* (1990) 226 Cal.App.3d 277, 280, fn. 2 [where the defendant was on parole, his appeal seeking additional custody credits was not moot because "receiving additional custody credits would give defendant an earlier constructive release date and shorten his parole period"].)  In any event, because the Attorney General does not address the potential effect of resentencing on Uribe's parole, we conclude he has not carried his burden to establish mootness, and accordingly we will vacate the sentence and remand the matter for resentencing.

## DISPOSITION

Our opinion in *Uribe*, *supra*, A164502 is vacated.  The judgment of conviction is affirmed, but the sentence is vacated, and the matter is remanded to the trial court for resentencing in accordance with the views expressed in this opinion.

_____

                    RICHMAN, ACTING P. J.

We concur.

_____

MILLER, J.

_____

DESAUTELS, J.

(*The People v. Uribe A164502N*)